IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

M.Y.M., a Minor,
by and through his mother and
next friend Vilma Portillo,

    Plaintiff,

v.                          Civil Action No. 3:21cv102

WILLIAM A. CHAVIS,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 21) ("the Motion").

William Chavis is an Officer in the Chesterfield County Police Department. M.Y.M. is a minor and a resident of Chesterfield County. The Complaint, filed pursuant to 42 U.S.C. §§ 1983 and 1988,[1] (ECF No. 1) alleges that Chavis used excessive force in arresting M.Y.M. in violation of the Fourth and Fourteenth Amendments to the United States Constitution (Count I) and Virginia tort law (Count II). M.Y.M. seeks damages and attorney fees.

The Motion argues that Chavis is entitled to summary judgment under the doctrine of qualified immunity because his actions did

---

[1] 42 U.S.C. § 1983 provides no substantive basis for a claim. Instead, it permits the filing in federal court of an action seeking redress of the violation of federal statutory or constitutional rights by a person acting under color of state law.

not violate the Constitution and because applicable case law did not clearly establish that his use of force was unconstitutional.

The parties contest whether Chavis intentionally threw M.Y.M. to the ground or whether Chavis and M.Y.M. unintentionally slipped to the ground while Chavis was trying to handcuff M.Y.M.  Chavis argues that, even if he did intentionally throw M.Y.M. to the ground, that would not constitute excessive force in violation of the Fourth Amendment's prohibition of unreasonable seizures, while M.Y.M. argues that the degree of force used by Chavis is clearly established to be unconstitutional.

Having considered the parties' briefing, footage of the incident recorded by Chavis's body camera, depositions of both of the parties, the arguments made at the hearing, and the relevant case law, the Court concludes there are genuine issues as to whether Chavis intentionally threw M.Y.M. to the ground and that, if a jury were to so find, the right to be free from such force on the facts of this record was clearly established.  Therefore, and for the reasons explained below, the Motion will be denied.

## FACTUAL BACKGROUND

The events at issue in this case occurred on October 27, 2020, when Officer Chavis saw M.Y.M., then 15 years old, walking along Whitepine Road through the Harry G. Daniel Public Park in Chesterfield County, Virginia shortly after midnight, well after the park was closed for the day.  ECF No. 22-3 at 10.  The factual

2

claims set forth by both parties in their pleadings and memoranda are supplemented by footage from Officer Chavis's body camera and by the deposition testimony of Chavis and M.Y.M.

According to Chavis's deposition, he initially drove past M.Y.M., who was walking alone along the portion of Whitepine Road that passes through the park after the park was closed and after curfew. As Chavis explained in his deposition, "The first thing that drew my attention was just that there was a person in the park, period . . . there were no other people in the park. The park was supposed to be closed." ECF No. 22-3 at 10. Chavis further explained in his deposition that he suspected that M.Y.M. was a juvenile based on "[h]is size." Id. at 13.

Chavis was alone on patrol that night, as was standard practice. ECF No. 22-3 at 9. He knew that backup was available but did not know precisely how long it would take backup to arrive if summoned. Id. at 13.

After noticing and passing M.Y.M. on the side of the road, Chavis turned and drove up to M.Y.M. from behind, at the same time turning on the emergency lights on his police cruiser. At this point, Chavis activated his body camera and walked over to the grassy area on the side of the road where M.Y.M. was "squatting." Id. at 14.

3

Chavis spoke to M.Y.M. "to determine what [his] (i.e., Chavis's) next steps would be." Id. Their initial dialogue, transcribed from the body camera footage, is as follows:

Chavis:    How did you get out here?

M.Y.M.:    I was at a friend's house.

Chavis:    Okay. Does mom and dad know where you are?

M.Y.M.:    They have my address but they're probably asleep right now [unintelligible]

Chavis:    Okay, but how are you going to get there? Obviously walk?

M.Y.M.:    [Unintelligible] . . . I can't fly, can I?

Chavis:    Huh?

M.Y.M.:    I can't fly, can I?

Chavis:    You can't fly? Okay, stand on up for me, okay?

           [M.Y.M. stands]

Chavis:    Put your hands behind your back for me for one second, okay?

M.Y.M.:    Why?

Chavis:    Because I'm asking you to.

As M.Y.M. asks Chavis "why?," M.Y.M.'s right hand, which is visible holding his phone at about chest height, lowers out of sight. Within approximately two seconds of his response to M.Y.M. ("because I'm asking you to"), Chavis can be seen (at the 0:55 mark) pulling on M.Y.M.'s arm. As M.Y.M. stumbles he says "you're trying to hurt me." What happens next is difficult to follow.

4

M.Y.M. is visible with his right arm being held by Chavis and his left hand at his side.  His body is leaning away from Chavis at the 0:58 mark, apparently stumbling as he and Chavis each rotate clockwise.  M.Y.M. then straightens up and says, "I ain't do nothing, I ain't do nothing."  At the same time, Chavis begins repeating the command "get on the ground," saying it a total of four times in the next three seconds.  As he repeats it, there is a brief glimpse of M.Y.M. with both of his hands behind his back, though it is unclear at that point whether Chavis is holding both of M.Y.M.'s hands or only his right hand.  The screen is then dark for a moment.  In the next visible frame, it is apparent from the camera angle that Chavis is lying horizontally on the ground.  He then moves on top of M.Y.M. to handcuff him, straddling him while M.Y.M. is lying on his stomach.  A later medical examination revealed that M.Y.M. suffered a broken collar bone from the incident.

The parties give different accounts of the exact way that M.Y.M. ended up on the ground.  Chavis's deposition adds some details to what can be discerned in the video.  Chavis says that, as the handcuffing process began, M.Y.M. "start[ed] to stiffen and lock his arms up," which Chavis took to [indicate] . . . that he was going to resist further."  Id. at 47.  Chavis describes the handcuffing process as proceeding through the sequence of the "law enforcement grasp," attempting but failing to implement the

"twist-lock," and finally wrapping both his arms around M.Y.M. to attempt to bring him to the ground.

Chavis describes the law enforcement grasp as "gripping around his right wrist and elbow to actually move his arm behind his back." EC No. 22-3 at 17. According to Chavis, when the law enforcement grasp is unsuccessful in immobilizing a detainee, he would ordinarily proceed to implement the twist-lock. The twist-lock is described as follows:

> [W]hen you attempt the law enforcement grasp, if the person pulls away from you there's a way . . . that you hold onto their hand and twist in a fashion that creates pressure throughout. It's pain compliance is what it is through the joints, through the wrist, the elbow, up into the shoulder that is supposed to cause the person to then be more likely to comply with you. I was going to attempt that. At no point was I able to successfully utilize it, but I was going to attempt it. Id. at 18.[2]

When asked if he had any intention of ending up on the ground himself, Chavis answered, "absolutely not." Id. at 50. He later added, "The goal is never to be on the ground with a suspect. If that's what's happened then something has gone wrong . . . ." Id. at 50. Chavis further explained that, because he was unable to get M.Y.M. to the ground, his plan was then "to pull [M.Y.M.] in and bear hug him . . . to try to kind of hold him and calm him and

---

[2] Later in his deposition, Chavis again says that he "was not able to gain any kind of control over [M.Y.M.'s] hand or wrist to even be able to initiate [the twist-lock technique]." ECF No. 22-3 at 47. Chavis's memorandum in support of his Motion says that he "considered using a 'twist-lock' technique . . . [but] was not able to use [it] due to Plaintiff's resistance." ECF No. 22 at 5.

get him to the ground." _Id._ at 59.  Chavis then states that he "eventually [got] an arm around" M.Y.M..  _Id._  But in describing how he and M.Y.M. came to be on the ground, Chavis stated that "We didn't throw at all. We fell." _Id._ at 63.

At the hearing on the Motion, Chavis's counsel repeated Chavis's claim that his intent had not been himself to end up on the ground with M.Y.M. but instead to wrap M.Y.M. in a "bear hug" and then to put M.Y.M. on the ground.  Counsel then further asserted that it was "clear from the footage" that that was what happened, and that they "slipped and fell" to the ground.  But Chavis's counsel did not dispute that Chavis had intended to "take" M.Y.M. to the ground.  When asked how, from the position of a bear hug, Chavis would have put M.Y.M. on the ground without himself ending up on the ground, Chavis's counsel visually demonstrated. When asked if the motion she demonstrated was a throwing motion, Chavis's counsel replied "It could be called throwing, taking. We're okay with any of those terms."  Likewise, the brief in support of the Motion appears ambiguous as to the question of whether Chavis actually did throw M.Y.M.: "the minimal force [Chavis] used to counter Plaintiff's physical resistance and gain control of the situation by taking Plaintiff to the ground to be

handcuffed did not violate Plaintiff's clearly established Fourth Amendment right." ECF No. 22 at 1.[3]

M.Y.M. at many points during his deposition professes to lack a clear memory of the events.[4] But he nevertheless recalls some details of the incident. In his deposition testimony, M.Y.M. describes Chavis as thr[owing] [him] over his, like, shoulder . . . [and] land[ing] on top of [M.Y.M.]." ECF No. 22-2 at 74. Later, when asked how Chavis got him to the ground, M.Y.M. responded: "He threw me." Id. at 77. He uses similar language a final time toward the end of the deposition, stating that "[Chavis] threw me over him I guess or something like that . . . he threw me -- threw me face-first." ECF No. 22-2 at 108. This is also the language that M.Y.M. uses in the body camera footage at the 1:41 mark, immediately after he has been taken to the ground, as Chavis is handcuffing him. M.Y.M. says to Chavis, "I don't know why you had to throw me. I'm not trying to fight you."

---

[3] Were it the case that Chavis and M.Y.M. simply slipped as Chavis was trying to handcuff M.Y.M., it is not clear that that would constitute any force at all, even "minimal" force. This language is thus ambiguous as to whether it is conceding that Chavis did intentionally use some amount of force to throw M.Y.M. to the ground or if the brief is instead describing a loss of balance as the application of "minimal force."

[4] It bears mentioning that M.Y.M. was deposed first, with Officer Chavis present at the deposition. ECF No. 22-2 at 3. M.Y.M. gave his deposition testimony without having seen Chavis's body camera video. ECF No. 22-2 at 68. Chavis's deposition was taken the next day, in the course of which he sometimes answers questions with reference to the answers given by M.Y.M.

## THE DOCTRINE OF QUALIFIED IMMUNITY AND STANDARD OF REVIEW

As applied today, the doctrine of qualified immunity was defined by the Supreme Court of the United States in <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982).[5]  In <u>Harlow</u>, the Court began its discussion by observing that:

> our decisions consistently upheld that government officials are entitled to some form of immunity from suits for damages.  As recognized at common law, public officers <u>require this protection to shield from undue interference with their duties</u> and <u>from potentially disabling threats of liability</u>.

<u>Id.</u> at 806 (emphasis added).

Although the petitioners in <u>Harlow</u> sought absolute immunity and a so-called special immunity, the Supreme Court rejected application of that level of immunity for those particular defendants.  However, the Court agreed that the concept of <u>qualified</u> immunity was available to the defendants.  In explaining the concept of qualified immunity, the Supreme Court observed:

> . . . it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty – <u>at a cost not only to the defendant officials, but to society as a whole</u>.  These social costs include expenses of litigation, the <u>diversion of official energy</u> from pressing public issues, and the <u>deterrence of able citizens from acceptance of public office</u>.  Finally there is the <u>danger</u> that the <u>fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible</u> [public officials] in the <u>unflinching discharge of their duties</u>.'

---

[5] <u>Harlow</u> is a companion case to <u>Nixon v. Fitzgerald</u>, 457 U.S. 731 (1982).

Harlow v. Fitzgerald, 457 U.S. at 814 (emphasis added).

Though Harlow was nominally a case about the immunity extended to officials in the Executive Branch, the majority opinion included a footnote that suggested that the qualified immunity described would apply much more broadly:

> This case involves no issue concerning the elements of the immunity available to state officials sued for constitutional violations under 42 U.S.C. § 1983. We have found previously, however, that it would be 'untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.'

457 U.S. at 818 n.30 (quoting Butz v. Economou, 438 U.S. 478, 504 (1978)). The Supreme Court soon confirmed the footnote's implications. Less than a month after Harlow was decided, the Court vacated a Sixth Circuit opinion that had affirmed a district court's denial of summary judgment to state parole officers against a § 1983 claim. Wolfel v. Sanborn, 666 F.2d 1005 (6th Cir. 1981). The order vacating the lower court's ruling directed reconsideration in light of Harlow and the quoted passage in Butz, thus making clear Harlow's application to state officials in § 1983 cases. Sanborn v. Wolfel, 458 U.S. 1102 (1982).

The doctrine of qualified immunity "shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" City of Talequah v. Bond, 595 U.S. ___, ___ (slip op. at 3) (2021) (quoting Pearson v.

10

Callhan, 555 U.S. 223, 231 (2009)).  It protects "all but the plainly incompetent or those who knowingly violate the law," id. (cleaned up),  and balances the interests of "hold[ing] public officials accountable when they exercise power irresponsibly" and "shield[ing] officials from harassment, distraction, and liability when they perform their duties reasonably," giving them "breathing room to make reasonable but mistaken judgments." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotations marks and citations omitted).

A qualified immunity analysis follows a two-step procedure: determining "whether a constitutional violation occurred" and whether "the right violated was clearly established." Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 538 (4th Cir. 2017) (quoting Melgar v. Green, 593 F.3d 348, 353 (4th Cir. 2010)).  At the summary judgment stage, a court analyzing the first prong must specifically decide whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001).  In answering this question, all reasonable inferences must be drawn on behalf of the nonmoving party.  Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992).

A court may consider the two prongs of the analysis in either order.  Pearson, 555 U.S. at 236.  The plaintiff bears the burden of proving the violation of a right and the defendant bears the

burden of proving that the right in question was not clearly established. <u>Mays v. Sprinkle</u>, 992 F.3d 295, 302 n.5 (4th Cir. 2021).

## I.    Legal Standard for Excessive Force

In <u>Graham v. Connor</u>, the Supreme Court of the United States decided "what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person."   490 U.S. 386, 388 (1989).   In so doing, the Supreme Court held that:

> Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their person . . . against unreasonable . . . seizures' of the person.

<u>Id.</u> at 396.[6]   The Supreme Court went on to explain that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing Governmental interests at state."   <u>Id.</u> at 396

---

[6] The Supreme Court further stated that "<u>all</u> claims that law enforcement officers had use excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonable' standard rather than under a 'substantive due process' approach."   <u>Id.</u>

(citations omitted).  Then, the Supreme Court reminded courts that "[our] Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396 (citations omitted). And, applying the Fourth Amendment test of reasonableness

> "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

Id.  That determination (i.e., the reasonableness of a particular use of force) must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  And a court's assessment must be made in perspective of the instructions that: (1) "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment;" and (2) "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 397 (internal citations omitted).  Finally, the Supreme Court made clear that the reasonableness inquiry in a

case involving excessive force is an objective one; and on that point, the Court instructed that:

> The question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. (internal citations omitted). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively use of force constitutional. (citations omitted).

Id. at 396-397.

The issue is, "ultimately, . . . 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure'." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015) (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)). The Fourth Circuit has further elaborated that "[a]n inquiry into any predisposition for force on the part of [the Officer] is an improper mode of analysis for a Fourth Amendment excessive force claim." Pegg v. Herrnberger, 845 F.3d 112, 120 (2017). Finally, courts are cautioned to avoid "artificial divisions in the sequence of events," because they "do not aid a court's evaluation of objective reasonableness." Smith, 781 F.3d at 101 (quoting Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005)).

The factors to be applied are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S.

14

at 396.    Though these factors are to be assessed from the
perspective of the police officer, the Court must determine the
appropriate perspective for an objectively reasonable police
officer.  Graham, 490 U.S. at 397.

The Fourth Circuit has also stated that the severity of injury
a plaintiff suffered is relevant to an excessive force analysis in
addition to the Graham factors.  See Lawhon v. Mayes, No. 20-1906,
2021 WL 5294931 (4th Cir. Nov 15, 2021) ("In addition to applying
the Graham factors, we also take into account the severity of the
injuries in our determination of whether officers used excessive
force.") (citing Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir.
2003)).

## II.  Whether a Right Was Clearly Established

Qualified immunity is meant in part to "protect[] officers
who commit constitutional violations but who, in light of clearly
established law, could reasonably believe that their actions were
lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011).  To
be clearly established, the contours of a right "must be
sufficiently clear [such] that a reasonable official would [have]
underst[ood] that what he is doing violates that right." Owens v.
Baltimore City State's Atty's Office, 767 F.3d 379, 398 (4th Cir.
2014).

The Supreme Court has "not yet decided what precedents--other
than [their] own--qualify as controlling authority for purposes of

qualified immunity." <u>District of Columbia v. Wesby</u>, 583 U.S. ___,

___, 138 S. Ct. 577, 591 n.8 (2018).  In the absence of definitive

guidance on this issue from the Supreme Court, the Fourth Circuit

has stated:

> In conducting the clearly established analysis, we first
> examine cases of controlling authority in [this]
> jurisdiction--that is, decisions of the Supreme Court, this
> court of appeals, and the highest court of the state in which
> the case arose.  We ordinarily need not look any further than
> decisions from those courts.

<u>Booker v. S.C. Dep't of Corr.</u>, 855 F.3d 533, 538-39 (4th Cir.

2017); <u>see also</u> <u>Ray v. Roane</u>, 948 F.3d 222 (4th Cir. 2020) ("[T]o

determine whether a right was clearly established we first look to

cases from the Supreme Court, this Court, or the highest court of

the state in which the action arose.").  Of course, "[i]n the

absence of 'directly on-point, binding authority,' courts may also

consider whether 'the right was clearly established based on

general constitutional principles or a consensus of persuasive

authority.'"  <u>Id.</u> at 229 (citing <u>Booker v. S.C. Dep't of Corr.</u>,

855 F.3d at 543).

     In determining whether the law in question was clearly

established for purposes of carrying out a qualified immunity

analysis, courts are instructed "not to define clearly established

law at a high level of generality." <u>Id.</u> at 742.  For example,

"that an unreasonable search or seizure violates the Fourth

Amendment is of little help in determining whether the violative

nature of particular conduct is clearly established." Id. Qualified immunity thus gives state actors, including police officers, "breathing room to make reasonable but mistaken judgments about open legal questions." Id. at 743.

The Supreme Court has further explained that, for purposes of qualified immunity analyses, a rule's contours "must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." City of Talequah v. Bond, 595 U.S. ___, ___ (slip op. at 3) (2021) (cleaned up). In resolving this issue, a court must ask whether "a reasonable officer could miss the connection between that case and this one." Id. at ___ (slip op. at 5).[7]

The Supreme Court has also "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" Wesby, 583 U.S. at 590 (quoting White v. Pauly, 137 S. Ct. 548, 552 (2017)). But this does not require that there be a case "directly on point," Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011); it requires instead

---

[7] Thus, it is also true that "general statements of the law are not inherently incapable of giving fair and clear warning" and that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 740-41 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 640-41 (1987)).

that the relevant constitutional or statutory question be "beyond debate." Id.

## DISCUSSION

Chavis's Motion will be denied because, his arguments to the contrary, he has not shown that that there is no dispute as to materially relevant facts respecting the conduct that is alleged to constitute excessive force. Put another way, if the facts are viewed in the light most favorable to M.Y.M., with all permissible inferences drawn in his favor, a reasonable juror could conclude that Chavis used a constitutionally unreasonable degree of force in bringing M.Y.M. to the ground. Summary judgment in Chavis's favor is therefore inappropriate.

Both parties in this case are inconsistent in the accounts that they give of what happened during the seconds when Chavis's body camera footage is partially or fully obscured. Chavis's analysis of the factual issues in the memorandum submitted in support of the Motion and at the hearing on the Motion misapprehends the record, omits mention of information contrary to Chavis's interest, and is filled with bald assertions that are plausible only if virtually every possible inference is made in Chavis's favor. While Chavis's account of the events may be true, and while at least some versions of his account do indeed clear Chavis of any unconstitutional use of force, inferences or assumptions in Chavis's favor are inapplicable at the summary

judgment stage, where all doubts and ambiguities must be resolved in favor of M.Y.M as the nonmoving party.[8]   Chavis's arguments are thus unavailing.

The test for use of force set out by the Supreme Court in Graham requires that a court consider "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officer or others, and [3] whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  480 U.S. 386, 396 (1989).  The application of the Graham factors to this case depends crucially on what version of events a finder of fact accepts.  Summary judgment will therefore not be granted because of the substantial factual disagreements between M.Y.M. and Chavis.

## I.   Severity of Crime at Issue

The underlying offenses at issue in this case--curfew violation and trespassing in the park after dark--are unquestionably minor, both being misdemeanors.  At his deposition, Chavis was asked, in reference to the Chesterfield Police

---

[8] This does not preclude the Court from following the very clear directive to make such inferences as would be reasonable for an objectively reasonable officer in Chavis's position to make.  For example, the parties dispute whether Chavis threw M.Y.M. to the ground.  The summary judgment standard requires accepting M.Y.M.'s claims as true and making inferences in favor of M.Y.M.'s account. The parties also dispute whether M.Y.M. was trying to evade arrest. Here, inference in Chavis's favor may be permissible if the Court were to find that an objectively reasonable officer in Chavis's position could reasonably infer that M.Y.M. was attempting to flee.

Department's use of force policy, which broadly mirrors the <u>Graham</u> factors:  "What about the crime at issue here did you factor in . . . about whether or not force should be used?"  ECF No. 22-3 at 60.  Chavis responded:  "Before I put my hands on him I would say the severity was very low.  Once he starts to actively resist me and pull away I would say the severity is quite high . . . ." <u>Id.</u>  Because resistance is a separate factor in the <u>Graham</u> test, however, it should not itself be factored into the analysis of the severity of the offense with which the officer is confronted in the first instance.

As the Fourth Circuit stated in <u>Smith v.Ray</u>, in turn comparing that case to <u>Rowland</u>, "this nonviolent misdemeanor offense was not of the type that would give an officer any reason to believe that [the defendant] was a potentially dangerous individual."  781 F.3d at 102; <u>see also</u> <u>Henry v. Purnell</u>, 652 F.3d 524, 532 (4th Cir. 2011) (en banc) ("[T]his case presents nothing to suggest Henry posed any threat whatsoever--no menacing conduct and no violent criminal history . . . a reasonable officer in these circumstances would have had no grounds for believing Henry was armed or dangerous.").  While it is true that Chavis did not at that point know whether M.Y.M. had a violent criminal history, nothing about M.Y.M.'s commission of the trespass and curfew misdemeanors indicated that he was a threat to Chavis's safety.

20

## II.  Whether Suspect Poses an Immediate Threat

The essential public service provided by police officers carries substantial risks to their lives and safety.  The Graham analysis therefore takes into account "whether the suspect poses an immediate threat to the safety of the officer or others." Graham, 480 U.S. at 396 (emphasis added).  The immediacy and nature of any threat is highly pertinent to determining the need for the use of force and the kind of force that can be used.

However, the Fourth Circuit has made clear that an officer cannot simply treat everyone as an equally grave threat to officer safety simply because of the abstract possibility that a person could be armed, or dangerous in some other way.  Thus, for example, in Smith, the Court of Appeals noted that the officer was "a pretty good size man," in the plaintiff's words, while the plaintiff was "a smaller woman."  Id.  Additionally, the officer "did not have any reason to believe that [the plaintiff] was armed" and the plaintiff had "given no indication that she was at all inclined to cause [the officer] any harm or that she had any capacity to do so . . . ."  Id.

At the time the events took place, Chavis stood 5'11" and weighed 180-190 pounds.  Chavis is trained in karate (third-degree black belt) and Brazilian jujutsu (blue belt).  ECF No. 22-3 at 7. M.Y.M. was 5'4-5" tall and weighed 115 pounds.  ECF No. 22-2 at 138-39.  In his deposition, Chavis makes several reference to

21

concerns for "officer safety."[9]  And, indeed, courts are instructed to remain highly cognizant of the fact that police officers have dangerous jobs, often having to make difficult judgment calls with little or no warning. See, e.g., Rowland v. Perry, 41 F.3d 167, 172 (4th Cir. 1994) ("The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action."). But Fourth Circuit case law makes clear that a reasonable officer could and ought to take into account the 6-7 inch difference in height and the 70-pound difference in weight, as well as Chavis's substantial martial arts training.  Moreover, nothing else in the record bespeaks a safety risk; and, indeed, Chavis chose to confront M.Y.M. without calling for backup.  By the standard clearly established in Smith, the second Graham factor tells against the reasonableness of Chavis's use of force.

According to Chavis's deposition testimony, as he approached M.Y.M., M.Y.M. switched his position from standing to squatting down.  ECF No. 22-3 at 14.  Chavis chose to have M.Y.M. stand up off the ground only after M.Y.M.'s sarcastic response to him ("Well I can't fly, can I?").  It was at that point that Chavis instructed M.Y.M. to stand because he intended to detain him.  Id. at 15.  As Chavis explained this decision:

---

[9] ECF No. 22-3 at 16, 23, 40, 41, 48, 50, 60.

> His demeanor, his statement, his tone to me suggested to me and considering the totality of the circumstances as to what I was dealing with that I had someone who was disrespectful. It didn't anger me, but in considering that with all of the many factors it indicated to me that there was a higher likelihood that he would be combative with me or try to run, and I felt for my safety it was better to put him in handcuffs so he was at a lesser risk for both himself and for myself.

Id. at 16.  At the hearing, Chavis's counsel characterized M.Y.M.'s sarcastic response as being "noncooperative."  While acknowledging that a sarcastic response does not in itself justify arrest, Chavis's counsel nonetheless argued that it justified Chavis in thinking M.Y.M. to be a danger.  But see Smith, 781 F.3d at 98 (denying qualified immunity even where arrestee "pull[ed] away" from officer and "call[ed] [him] . . . a n***r.").  Nor is disrespectful conduct of the sort shown here, standing alone, a basis for using force.  Thus, even though Chavis invoked M.Y.M.'s disrespect as a reason for believing that officer safety necessitated force, on this record, that is a fact question for a jury to determine.

Additionally, Fourth Circuit case law is clear that an officer cannot justify the use of force with the fear that a suspect may be armed where the officer can cite to no reason for thinking the detainee to be armed.  In Smith, for example, the detainee actually was armed with a knife, but because she did not reach for it, and the officer did not notice it until the interaction was over, it could not be used to justify the officer's behavior as an

objectively reasonable response.  Id. at 104-05.  The Smith court then goes on to collect cases giving examples of the kind of positive evidence an officer ought to have in order reasonably to draw the conclusion that the suspect may be armed.  Id.  In other words, an officer must have some actual reason for regarding a suspect as potentially armed and dangerous.  Chavis makes no such factual showing here.

The objective test for Fourth Amendment violations means that neither the Court nor the jury is to judge the lawfulness of Officer Chavis's conduct with reference to the perception that his decision to arrest M.Y.M. and his use of force against M.Y.M. were the result of irritation because of M.Y.M.'s sarcastic response to his question.  So long as Chavis had cause to arrest M.Y.M., which he did because of the misdemeanor charges, the Court is not to inquire further as to Chavis's subjective motivations for choosing to detain and arrest M.Y.M.  See Pegg v. Herrnberger, 845 F.3d 112, 119 (4th Cir. 2017) ("The proper focus of the inquiry is not any subjective reason for arresting Pegg, but only the objective facts surrounding the arrest.").

But in viewing all the facts of the case and Chavis's argument, the Court can, and, indeed, must consider whether, absent any such irritation, a reasonable officer would have reason to treat M.Y.M. as presumptively dangerous.  A jury could find that a reasonable officer--one not irritated by M.Y.M.'s sarcasm--would

not have regarded M.Y.M. as presumptively dangerous.  M.Y.M., for his part, makes precisely this claim:  that Chavis decided to handcuff him only because he was angered by M.Y.M.'s sarcastic response.  ECF No. 22-2 at 87.  While that does not factor into the reasonableness of Chavis's decision to arrest M.Y.M., which was clearly within his discretion, it does cast doubt on Chavis's claim that he reasonably viewed M.Y.M. as a threat to his safety. A juror could consider, as evidence on this factor, the facts that: (1) M.Y.M. did not in any way physically threaten Chavis or make suspicious movements that might have indicated that he was armed or otherwise dangerous; (2) Chavis chose to have M.Y.M. stand to be handcuffed then rather than waiting for backup; and (3) Chavis knew that M.Y.M. was a minor and that he had a substantial physical advantage over M.Y.M.   Taking all these considerations into account, a reasonable juror could find that the evidence as to the second Graham factor augurs strongly against the use of force.

## III. Whether the Suspect is Actively Resisting Arrest or Attempting to Evade Arrest by Flight

At the hearing, Chavis's counsel claimed that there is "no question" that M.Y.M. was attempting to evade arrest by flight and repeatedly claimed that M.Y.M. was trying to pull free in order to run away from Chavis.  But the record does not contain evidence that supports that claim.  Indeed, Chavis's counsel acknowledged as much, arguing only that it can be inferred from the positioning

of M.Y.M.'s body in the video:  M.Y.M., the attorney pointed out, can be seen with his body oriented to the west, in the direction where Whitepine Road leads out of the nearer of two exits out of the park.  But this is precisely the sort of inference in favor of the moving party that the Court cannot make at the summary judgment stage.  Realizing this, Chavis's counsel then argued that the Court could draw this inference in ascertaining what a reasonable police officer in Chavis's position might conclude.

In support of that argument, Chavis's counsel claimed that M.Y.M. was continuously pulling away from Chavis, disregarding his command to put his hands behind his back, and disregarding his command to get on the ground, and that these facts could lead an objectively reasonable officer to conclude that M.Y.M. was attempting to evade arrest by flight.  Similarly, in his brief in support of summary judgment, Chavis argues that "[a]t no point until after both Plaintiff and Officer Chavis were on the ground did Plaintiff comply with Officer Chavis' lawful orders."  ECF No. 22 at 15.  But that view is not borne out by the record.

To the contrary, when Chavis first saw M.Y.M., he was walking; and, when Chavis turned his emergency lights on and approached, M.Y.M. stopped walking and then squatted down in place.  In the body camera footage, M.Y.M. clearly and truthfully answers each of Chavis's first two questions.  Even M.Y.M.'s sarcastic response to Chavis's question as to how he would get home ("how are you going

26

to get there? Obviously walk?") itself conveyed an answer to the question, albeit impolitely. When Chavis told M.Y.M. to put his hands behind his back, M.Y.M. first asked "why?" but then, after Chavis replied, "because I'm asking you to," M.Y.M. claims to have begun to comply by putting his right hand behind his back, only for Chavis to seize and twist M.Y.M.'s arm before he had the opportunity fully to comply. ECF No. 22-2 at 92.

In the body camera footage, when Chavis tells M.Y.M. to put his hands behind his back, M.Y.M.'s right hand, visible in the frame holding a phone, immediately drops down and out of sight. A reasonable juror could conclude that M.Y.M. had put his right hand behind his back when instructed to do so and was beginning to put his left hand behind his back, just as he claimed in his deposition testimony, when Chavis preemptively grabbed and twisted his harm, causing him pain, causing an automatic stiffening of his arm and rotation of his body along the vector of force in a reflexive attempt to alleviate the pain he felt. Finally, a juror might well observe that Chavis's instruction to M.Y.M. to "get on the ground" was repeated in rapid succession as M.Y.M. was off balance, with Chavis holding one or both of his hands behind his back, in a position in which it may well have difficult or impossible for M.Y.M. to comply. Failure to comply with a command with which it is not possible to comply cannot be treated as "disregarding" the command or as probabilistic evidence of an intent to evade arrest

by flight.   See Smith v. Ray, 781 F.3d 95, 105-06 (4th Cir. 2015) ("[I]t was of course possible that the suspect could take off running . . . However, on the facts before us at this stage, there was no reason for Ray to expect that the previously compliant suspect would suddenly take that course.").

Thus, the entire substance of Chavis's argument as to the third Graham factor is predicated on highly contested factual claims--claims about which it is not only possible for a reasonable juror to disagree but about which, in the Court's judgment, Chavis's interpretation of events strains credulity, making it likely that the third Graham factor would be resolved in M.Y.M.'s favor.   M.Y.M.'s initial compliance, his exclamation "you're trying to hurt me" at the 0:55 mark, and Chavis's choice not to explain to M.Y.M. that he was being handcuffed and not to give M.Y.M. more of an opportunity to comply with the instruction to put his hand behind his back all indicate that a juror could very well, on the evidence presented, draw the conclusion that no objectively reasonable officer would have believed M.Y.M. to be attempting to evade arrest by flight or to be resisting Chavis with anything more than a reflexive resistance to pain.

In sum, each of the three Graham factors points in favor of M.Y.M.'s claim that Chavis used excessive force in violation of the Fourth amendment in taking him to the ground.

IV.  **Quantum of Force Used**

In the summary judgment briefing and at the hearing, Chavis repeatedly argued that he must prevail on summary judgment because M.Y.M. does not articulate with adequate detail precisely how he was thrown to the ground.  But that claim is itself belied by the ample evidence available in Chavis's body camera footage, along with M.Y.M.'s statements in his deposition and his assertions in the Complaint and in his memorandum in support of his opposition to the motion for summary judgment.  That evidence, in aggregate, is substantial.  It includes the following pieces of evidence:

- M.Y.M.'s first description of the events in his deposition states that "[Chavis] he threw me over his, like, shoulder and stuff, and, like, he landed on top of me . . . ."  ECF No. 22-2 at 74.

- M.Y.M.'s second description, in answer to the question "when Officer Chavis took you to the ground, how did he do it?", was to say: "He threw me."  Id. at 77.

- Later, M.Y.M. again says that Chavis "threw" him, and that he was not simply tackled.  Id. at 78.

- In his final description in the deposition, M.Y.M. says that Chavis "put my hands behind my back then he overleaped my . . . and threw me straight on the ground . . . ."  Id. at 109.

- In the portion of the body camera footage immediately after M.Y.M. has been taken to the ground, at 1:40, he says to Chavis, "I don't know why you had to throw me."

- At another point in the body camera footage, at 7:30, Chavis tells a Sergeant he is speaking to on the phone about the

event and says, "he was pulling hard from me, so I took him
[i.e., M.Y.M.] to the ground." [10]

- Later in the video, at 9:58, Chavis tells someone else on a
  phone call that he "ended up having to take him [i.e., M.Y.M.]
  to the ground."

- At the end of Chavis's body camera footage, at 17:47, Chavis
  describes to two other officers who have arrived on the scene,
  telling them that M.Y.M. was hurt when, "as we both fell
  together . . . I don't know. . . as he fell, his neck and his
  head and everything just went over all my gear."  At his
  deposition, Chavis professed not to recall what he had meant
  by that. His counsel likewise offered no account of what it
  meant for M.Y.M.'s head to have "[gone] over his gear."
  M.Y.M.'s attorney proposed the interpretation that it
  referred to Chavis's having picked up M.Y.M. and swung him
  across his (i.e., Chavis's) body in throwing him to the
  ground.  There are certainly other interpretations of the
  expression, but in Chavis's deposition and at the hearing,
  Chavis offered no alternative.

A final piece of evidence is inferential but nevertheless
important.  A reasonable juror might observe that at 1:00 in the
video, Chavis has succeeded in rotating M.Y.M.'s body so that he
is standing more or less still and more or less straight up with
both hands clearly visible behind his back, and oriented so that
Whitepine Road is to his right.  The screen is then dark for
approximately 2-3 seconds as Chavis's camera is pressed against
M.Y.M.'s back, and when M.Y.M. is next clearly visible, now on the
ground (at 1:07), he is lying fully stretched out on the ground
having rotated almost exactly 180 degrees, with Whitepine Road now
on his left.

---

[10] The video from the body camera would permit a finding that M.Y.M.
was not "pulling hard" from Chavis.

Taking all of this information into account, a reasonable juror could conclude that the best explanation for the 180 degree rotation of M.Y.M.'s body, in combination with a broken collar bone, is that Chavis picked M.Y.M. up and threw him to the ground in a swift rotating motion. A reasonable juror could take this inference to be strengthened by M.Y.M.'s consistent use of the term "throw" to describe how Chavis took him to the ground, from the very first moments after he was taken to the ground through his deposition, and by Chavis' statement that "M.Y.M.'s head and everything just went over all my gear."

Chavis's counsel argued that the span of time in the video during which the screen is black is not sufficiently long to allow for Chavis to execute a throw. But that is a quintessential question of fact, and in the absence of any sort of proof as to the claim, mere say-so does not in any way disprove the plausibility of M.Y.M.'s account of the events at issue.

## V. Applicable Case Law

Fourth Circuit case law clearly establishes that reflexive, or "automatic," resistance is not uncommon, should be anticipated by police officers, and does not justify the use of substantial force in response absent some additional reason to believe that force is necessary. Similarly, Fourth Circuit case law establishes that, when an officer gives a suspect commands that are effectively impossible to comply with, failure to comply with those commands

cannot then be used to justify the use of additional force.   See
Smith v. Murphy, 634 Fed. Appx. 914 (4th Cir. 2015) ("As for the
third Graham factor, resistance from Smith could be characterized
as instinctive, and we have twice concluded that such reactions do
not constitute active resistance.") (citing Smith v. Ray, 781 F.3d
95 (4th Cir. 2015) and Rowland v. Perry, 41 F.3d 167 (4th Cir.
1994)).

     At the hearing on the Motion, Chavis's counsel argued that
Pegg v. Hernberger stands for the proposition that throwing a
detainee to the ground is a per se permissible degree of force.
But that assertion misapprehends the substance of the case law
governing the use of force.   Graham makes clear that the
permissible quantum of force is relativized to the particular
features of the situation in which the force is used.   Thus,
throwing a suspect to the ground to detain him is in some cases
permissible and in some cases impermissible, just as using deadly
force is in some cases permissible and in some cases impermissible.
The question is thus whether the degree of force alleged to have
been used in this case was reasonable relative to the context in
which it was used.   See Smith v. Ray, 781 F.3d at 106 n.8 ("Of
course, we do not hold that the level of force Ray employed here
was per se unconstitutional in all circumstances.   Rather, we
merely hold that any reasonable officer would have known that, on

the particular facts of this case, Ray's actions constituted excessive force.").

Rowland v. Perry and Smith v. Ray both involve resistance that is automatic but that does not absolve the officer of using excessive force. The legally relevant parallels between those cases and this case are substantial enough that Chavis was clearly put on notice that, under the circumstances, the kind of force that a jury could find was used against M.Y.M. here is constitutionally unreasonable.

Rowland involved a "scuffle between a police officer and a citizen over a lost five dollar bill." 41 F.3d at 167. On the plaintiff's version of events in that case, the officer, "without any provocation . . . grabbed his collar and jerked him around, yelling harshly as he did so." Id. at 172. The plaintiff, "[f]rightened, . . . instinctively tried to free himself." Id. The "scuffle" continued until the officer used "disabling force," id. at 171, by pulling on the plaintiff's leg and "wrenching the knee until it cracked," id. at 172, whereupon the struggle ceased.

In defending himself, the officer in Rowland urged the Court to employ "what amounts to a segmented view of the sequence of events." Id. at 173. On this approach, the Court would look to the officer's first grabbing the plaintiff by the collar in response to an attempt to flee, and then would note the escalation of use of force in response to the plaintiff's "resistance." Id.

33

"Viewed in this way," the officer argued, "each distinct act of force becomes reasonable given what [he] knew at each point in this progression." Id.

But the Fourth Circuit rejected this segmented approach, holding that "[a]rtificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness," id., and that reasonableness of a seizure should be assessed "in a larger perspective." Id. "When all the factors are considered in toto," the Court concluded, "it is impossible to escape the conclusion that a man suffered a serious leg injury over a lost five dollar bill." Id. at 173-74. In drawing this conclusion, the Court again emphasized that there was "[no] real evidence that this relatively passive, retarded man was a danger to the larger, trained police officer," id. at 174, and that the plaintiff "resisted only to the extent of instinctively trying to protect himself." Id.

The events in Smith v. Ray in many ways parallel both Rowland and this case. In Smith, an officer was helping a citizen find his missing juvenile stepson. Believing the stepson to be inside a residence, the officer knocked on the door, which was answered by Smith. 781 F.3d at 98.

After Smith indicated to the officer that she would go inside to look for someone, the officer reached over Smith and forced the door shut, then grabbed Smith's arm. Id. When Smith pulled her

34

arm away and "asked what he was doing," the officer, "[r]ather than responding verbally, . . . tried to grab Smith again." <u>Id.</u> While pulling away, Smith "called Ray--who is white--a n***r," <u>id.</u>, but did not run away. The officer then threw Smith to the ground, still without offering further explanation. With Smith on the ground, the officer then began ordering her "to show him her arms." <u>Id.</u> Smith was unable to comply because she was using her left arm "to press against the ground to try to relieve pressure from her chest." <u>Id.</u> The officer then punched her several times until he eventually pulled Smith's other arm out and handcuffed her. <u>Id.</u> at 99. At no point in the interaction did the officer "explain[] that Smith was subject to an investigative detention or under arrest." <u>Id.</u> Nor did Smith ever "str[ike] out at" the officer. <u>Id.</u>

Here, as in <u>Ray</u>, M.Y.M. never struck out at Chavis, and Chavis never explained to M.Y.M. that he was under arrest, responding to his question as to why he was being instructed to put his hands behind his back by saying "because I said so." Likewise, in Ray, the plaintiff "pulled her arm away, and . . . asked what [the officer] was doing," after which, [r]ather than responding verbally," the officer "tried to grab [the plaintiff] again." 781 F.3d at 98. The plaintiff in that case explained that, "[a]lthough [she] initially pulled [her] arm away, [she] did not run [but] stayed and questioned [her] arrest." <u>Id.</u> at 105. Here, too,

M.Y.M. claims reflexively to have pulled his arm in response to pain caused by Chavis's grip. Without explaining that M.Y.M. as being detained or arrested, Chavis then continued to exert painful force on M.Y.M.'s arm--M.Y.M. can be heard in the video saying "you're trying to hurt me" at the 0:55 mark. By the time Chavis begins commanding M.Y.M. to "get on the ground," he has M.Y.M.'s right arm pulled and twisted behind his back. While it is unclear if M.Y.M.'s left arm is fully secured by Chavis's grip, it is also behind his back just before M.Y.M. is taken to the ground. In his deposition, referring to this moment, M.Y.M. said "How am I supposed to get on the ground while somebody's grabbing my hands, trying to put my hands behind my back[?]"

On this record, a jury could reasonably find that Chavis did not give M.Y.M. a real opportunity to comply with his request before applying force to M.Y.M.'s arm because Chavis began twisting the arm before M.Y.M. had the chance to get both arms behind his back; that M.Y.M.'s resistance was, to use Rowland's language, "automatic" in response to Chavis's painfully twisting his arm; and finally, that Chavis did not give M.Y.M. a real opportunity to comply with his order to "get on the ground" before intentionally picking up M.Y.M. and throwing him to the ground with substantially greater force than was necessary. A juror might even conclude, given knowledge of Chavis's extensive background in jujutsu, that Chavis had instinctively resorted to an agressive throw learned in

that martial art rather than the bear-hug technique that his attorney described at the hearing on this matter.  As evidence for these conclusions, a juror could look to M.Y.M.'s later statement in the body camera footage that he was "scared," as well as the other ways in which M.Y.M. demonstrates cooperation, such as in immediately standing up when told to do so by Chavis and in answering Chavis's questions.  To be sure, a jury could reasonably reach other conclusions--but there is ample evidence in the record so far compiled that would allow a reasonable juror to conclude that Chavis's use of force was unlawful.

Chavis makes much of supposed parallels between this case and Pegg v. Herrnberger, 845 F.3d 112 (4th Cir. 2017), in which an officer was granted qualified immunity after throwing a suspect to the ground.  But the differences between this case and Pegg are substantial and do not cast doubt on the parallels already noted between this case and Rowland and Smith, which were adequate to give Chavis clear notice of the unreasonableness of the force he is alleged to have used.

The events in Pegg occurred in the context of a traffic stop. Pegg, the driver, did not respond to an officer's "call[ing] out" to stop his car.  845 F.3d at 116.  When the driver was asked for identification, the officer believed that Pegg "reached for something between his legs."  Later, when the officer was with Pegg behind the car, he "demonstrated how Pegg should lock his

hands together" and asked him to do so.  Pegg then failed to follow the instruction.  Only then did the officer grab his arm, at which point Pegg turned his body around and questioned the officer.  The officer then used a modest initial degree of force, pushing Pegg against the car in an effort to handcuff him, which Pegg further resisted.  Id. at 116.  Only then did the officer take Pegg to the ground with a move that caused "minor scrapes and abrasions." Id.

Here, by contrast, Chavis did not instruct M.Y.M. on how to comply and, according to one permissible view of events, did not even give M.Y.M. the opportunity to comply with his command before applying force.  M.Y.M. also had not disregarded an officer's initial command, as the officer may have perceived Pegg to have done when he did not pull over as instructed.  Finally, the quantum of force used was clearly different, insofar as Pegg suffered de minimis injuries while being thrown on a roadway, while M.Y.M. suffered a broken clavicle while being taken down in a grassy area.

From the record so far compiled, a reasonable juror could reach different views as to how, precisely, Chavis took M.Y.M. to the ground. If Chavis and M.Y.M. slipped while Chavis was trying to arrest M.Y.M. then there was not, per se, any use of force in bringing M.Y.M. to the ground, and so a fortiori there was no excessive use of force.  If, on the other hand, Chavis intentionally and violently threw M.Y.M. to the ground using

substantially more force than was necessary, that would run afoul of the standard set by Supreme Court and Fourth Circuit case law. Because at the summary judgment stage all factual disputes must be resolved in favor of the nonmoving party, the Court finds that there is a genuine dispute as to a material fact respecting the degree of force used, thereby presenting the need for the jury to decide that question. Also, as a matter of law, it was clearly established before the events at issue in this case that the force that, according to one permissible view of the evidence, Chavis is alleged to have used in the context in which he is alleged to have used it is excessive under the standards set by the Fourth Circuit and the Supreme Court of the United States.

## CONCLUSION

Ascertaining the truth of the matter is a question of fact that must be tried before a jury. For the reasons given above, Chavis's Motion will therefore be denied. Count II of the Complaint stated a tort law claim under the law of Virginia. Both parties agree that this claim is governed by the outcome of the § 1983 claim. Consequently, summary judgment on this claim will likewise be denied.

It is so ORDERED.

_____ /s/
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  January 27, 2022